## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

KENNETH T. TRUHLAR,                           )
                                              )
   Plaintiff,                  )
                                              )
v.                                            )  No. 06 C 2232
                                              )
JOHN GRACE BRANCH #825 of the NATIONAL        )  Judge Rebecca R. Pallmeyer
ASSOCIATION OF LETTER CARRIERS, and           )
THE UNITED STATES POSTAL SERVICE,             )
                                              )
   Defendants.                  )

## MEMORANDUM OPINION AND ORDER

Plaintiff Kenneth Truhlar ("Plaintiff"), a former letter carrier with the United States Postal Service ("USPS"), was terminated in October 2005 for allegedly failing to report outside income on disability claim compensation forms he completed in 2000. In this action against the USPS and Defendant John Grace Branch No. 825 ("Branch 825") of the National Association of Letter Carriers ("NALC") under Section 301 of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185, Plaintiff alleges that the USPS terminated him without just cause, and that Branch 825 violated its statutory duty of fair representation by failing to pursue a grievance filed in 2001 and/or refusing to file a new grievance after Plaintiff's 2005 termination. Branch 825 and the USPS (collectively, "Defendants") move to dismiss Plaintiff's complaint as untimely. For the reasons explained below, Defendants' motions are denied.

## FACTUAL BACKGROUND[1]

Plaintiff, a resident of Berwyn, Illinois, was an employee of Defendant USPS from 1984 until September 23, 2005. (Compl. ¶¶ 2, 4.) During this time, Branch 825 was the certified collective

---

[1]  For purposes of a motion to dismiss, the court presumes the truth of all of the plaintiff's well-pleaded factual allegations. *McMillan v. Collection Prof'ls, Inc.*, 455 F.3d 754, 758 (7th Cir. 2006). In this case, Defendants ask the court to consider additional documents attached to their motions to dismiss, which they contend are properly before the court in light of certain attachments to, and references within, Plaintiff's complaint. Plaintiff moves to strike these documents, or alternatively, asks the court to convert Defendants' motions into motions for summary judgment and consequently consider affidavits and other evidence attached to Plaintiff's opposition brief. As discussed *infra*, the court declines to do so, and here considers the documents attached to the parties' briefs, where relevant, not as substantive evidence, but merely for the purpose of presenting a factual background.

bargaining unit for USPS employees, including Plaintiff, employed at the USPS facility in Westmont, Illinois. (*Id.* ¶ 5.) A collective bargaining agreement between Branch 825 and the USPS (the "National Agreement") covered these employees, including Plaintiff, and was in effect at all times relevant to this litigation. (*Id.* ¶ 6.) The National Agreement[2] provides that "[n]o employee may be disciplined or discharged except for just cause." (*Id.* ¶ 9.)

On November 11, 2001, Branch 825, on behalf of Plaintiff, filed a grievance (the "November 2001 Grievance") following Plaintiff's receipt of what he calls a "Notice of Personnel Action" (the "November 2001 Notice") from the USPS. (*Id.* ¶ 7; NALC Grievance Worksheet, Ex. A to Compl.) The November 2001 Notice, dated November 9, 2001, was in fact titled "Notice of Removal" and informed Plaintiff that he would "be removed from the Postal Service no sooner than thirty (30) calendar days from the date of this notice" based on a charge of "Unacceptable Conduct as Evidenced by [Plaintiff's] Failure to Disclose Pertinent Information of [*sic*] Department of Labor Form CA-7." (November 2001 Notice, Ex. 1 to Memorandum of Law in Support of Motion to Dismiss of National Association of Letter Carriers Branch 825 ("Branch 825 Mem").[3]) Beginning

---

[2]      The complaint states that Plaintiff does not have a copy of the National Agreement that was in effect through November 21, 2001, but asserts on knowledge and belief that its termination and grievance provisions are "substantially similar or identical" to those in the current National Agreement. (Compl. ¶ 6.) Plaintiff attached excerpts from the current National Agreement to his opposition brief, accompanied by an affidavit from one of his attorneys stating that the excerpts were downloaded from the NALC website on August 31, 2006. (2001-2006 National Agreement, Ex. 4 to Plaintiff's Memorandum Brief in Opposition to Defendants' 12(b)(6) Motions to Dismiss ("Pl.'s Resp."); McBride Aff. ¶¶ 2-3, Ex. 3 to Pl.'s Resp.) The "just cause" language appears in these excerpts, (2001-2006 National Agreement, Ex. 4 to Pl.'s Resp., at 78), and Defendants do not contend that either the 2001-2006 agreement or the previous agreement lacks this language.

[3]      Plaintiff attached to the complaint the grievance worksheet that Branch 825 filed on his behalf, (Ex. A to Compl.), but did not attach the November 2001 Notice upon which the grievance was based. Branch 825 attaches the November 2001 Notice to its motion to dismiss, contending that it was originally attached to the grievance worksheet and thus merely completes the document attached by Plaintiff. As explained below, the court agrees that the November 2001 Notice can properly be considered part of the pleadings.

in August 2000, Plaintiff had been receiving partial disability benefits as the result of injuries sustained in a 1998 mail truck accident. (*Id.*) The Notice charges that after the approval of his application for those benefits, Plaintiff had received $8,885.00 in compensation from employment with a music group called "BANG" from March 2000 through December 2000; but on Department of Labor compensation claim forms he completed during this time, Plaintiff had answered "no" when asked if he had "worked outside [his] federal job."[4] (*Id.*) According to the USPS, this violated several provisions of its Employee and Labor Relations Manual, thus constituting grounds for removal. (*Id.*) The November 2001 Grievance filed by Branch 825 sought rescission of the Notice. (NALC Grievance Worksheet, Ex. A to Compl.) According to the grievance worksheet, the USPS denied this request on or about November 21, 2001, after a "Step 1 Meeting", for the reason that "the seriousness of [Plaintiff's] actions warrant dismissal."[5] (*Id.*)

On February 25, 2002, following a "Step 2" meeting, Branch 825 and the USPS entered into a "Grievance Settlement" in which the parties agreed to "hold in abeyance" any further action on

---

[4] In a letter to the NALC in October 2005, Plaintiff stated that the accident occurred when he was rear-ended "while delivering mail via curbside." (Letter from Truhlar to Young of October 25, 2005 ("Truhlar Letter"), Ex. 2 to Branch 825 Mem.) According to Plaintiff, the accident resulted in neck injuries, as well as herniated and bulging discs in his back. (*Id.*)

In the same letter, Plaintiff explained that he answered "no" on the claim forms because he had "always construed my playing the Bass Guitar as my hobby since the age of 13," and that he "only played with the band on the weekends and on my personal time." (*Id.*) He acknowledged, however, that after his tax preparer had "notified" him in April 2000 that his "playing and recording music was no longer a hobby," he began reporting his music income to the IRS. (*Id.*)

The propriety of the court's considering the contents of the Truhlar Letter is at the heart of the parties' dispute for purposes of the pending motions. The court here merely states relevant portions of the letter's content.

[5] Neither the complaint nor the grievance worksheet provides details as to the "Step 1 Meeting," or explains the grievance process. Excerpts from the current National Agreement, attached to Plaintiff's opposition brief, describe the "Grievance-Arbitration Procedure" in some detail. (2001-2006 National Agreement, Ex. 4 to Pl.'s Resp., at 66-78.) As the court declines to convert Defendants' motions into motions for summary judgment, however, the court will not consider those materials in deciding Defendants' motions; the court thus declines to summarize those grievance procedures here. The court notes, however, that the current National Agreement refers to "Informal Step A", "Formal Step A", and "Step B", not "Step 1" and "Step 2". (*Id.* at 66-71.)

Plaintiff's November 2001 Grievance "pending disposition of charges brought against [Plaintiff] by the office of the United States Attorney on a related matter." (Compl. ¶ 8; Grievance Settlement, Ex. B to Compl.) Although neither the complaint nor the Grievance Settlement identify those charges, Plaintiff, in an October 2005 letter to the NALC, acknowledged that the U.S. Attorney was investigating whether Plaintiff intentionally defrauded the government by failing to disclose his extracurricular income. (Truhlar Letter, Ex. 2 to Branch 825 Mem.) Plaintiff alleges in his complaint that the U.S. Attorney "later dismissed all charges against" him, and that "[a]ll claims initiated by the [USPS] against Plaintiff, and brought before federal agencies were resolved in Plaintiff's favor." (Compl. ¶ 8.) The complaint does not indicate when the federal charges were dropped, nor does it explain what is meant by "claims . . . brought before federal agencies." (*Id.*) Plaintiff's letter to the NALC, however, states that his attorney informed him in July 2005 that the U.S. Attorney would not "pursue the criminal charges" against him. (Truhlar Letter, Ex. 2 to Branch 825 Mem.)

On October 17, 2005, Plaintiff received what the complaint labels a "Notice of Removal" dated September 23, 2005 (the "September 2005 Notice"). (Compl. ¶¶ 4, 10.) Paradoxically, this document is in fact titled "Notice of Personnel Action"; it lists "removal" as the specific personnel action in a box at the bottom of the page. (September 2005 Notice, Ex. C to Compl.) Like the November 2001 Notice, the September 2005 Notice cites "unacceptable conduct" arising from Plaintiff's "failure to disclose pertinent information" on Form CA-7. (*Id.*) Unlike the previous Notice, which runs three pages and contains a detailed narrative of Plaintiff's alleged failure to report outside income, the September 2005 notice is a single page that provides no explanation of the reason for Plaintiff's removal beyond the above statement. (*Id.*)

Plaintiff's employment status with the USPS leading up to his receipt of the September 2005 Notice is unclear. As noted, the November 2001 communication is titled "Notice of Removal" and informs Plaintiff that he "will be removed." (November 2001 Notice, Ex. 1 to Branch 825 Mem.) Plaintiff does not construe this as a notice of termination, however, instead alleging in the complaint

that the November 2001 Notice had "resulted in Plaintiff being placed on Emergency Placement on Off-Duty Status." (Compl. ¶ 7.)  He refers to the November 2001 Notice not as a notice of removal, but as a "Notice of Personnel Action", (*id.*), even though that language does not appear on that document; indeed, as noted, it is the September 2005 Notice that is labeled "Notice of Personnel Action."  Further clouding the issue, Plaintiff, in an affidavit attached to his opposition brief, states that he was in fact placed on "Emergency Placement Status" as of June 2001, which had resulted in his "being placed on indefinite unpaid suspension" at that time.[6]  (Truhlar Aff. ¶ 7, Ex. 1 to Pl.'s Resp.)  The February 2002 Grievance Settlement contains, in a field under Plaintiff's name labeled "Description", the phrase "Emergency Placement in Off-Duty Status."  (Grievance Settlement, Ex. B to Compl.)  It is thus unclear whether Plaintiff's "removal" in November 2001 constituted a termination from his then-current off-duty status, but that the termination had somehow been stayed when Branch 825 filed its grievance; or whether—as Plaintiff alleges in his complaint—the November 2001 Notice itself resulted in his placement on off-duty status.

For its part, Branch 825 asserts that Plaintiff was terminated in November 2001.  (Reply Memorandum of Law in Further Support of the Motion to Dismiss of the National Association of Letter Carriers Branch 825 ("Branch 825 Reply"), at 5.)  Noting that the September 2005 Notice lists Plaintiff's "last day in pay status" as June 26, 2001, (September 2005 Notice, Ex. C to Compl.), Branch 825 asserts that the USPS merely "re-issued" the November 2001 Notice in 2005, upon completion of the U.S. Attorney's investigation.  (Branch 825 Reply, at 6.)  Branch 825 does not, however, explain why re-issuance was necessary.  For purposes of this motion, the court accepts as true Plaintiff's allegation that he was placed on off-duty status in 2001 and terminated in 2005; the court notes, however, that the November 2001 Notice, which is properly before the court as part of the pleadings, is somewhat contradictory in that it suggests Plaintiff was "removed" at that time.

---

[6]     Apart from his affidavit, Plaintiff does not attach any documentation relating to any action taken in June 2001.

After receiving the September 2005 Notice, Plaintiff alleges that "in October 2005" he "protested to [Branch 825] representatives Eric Smith and Rich Treonis, and to the [NALC] regarding their failure to pursue the grievance against the [USPS]." (Compl. ¶ 11.) The complaint does not indicate what forms those protests took. Sometime after November 14, 2005, Plaintiff "received a letter of response from the NALC." (*Id.*) That letter, from NALC Executive Vice President Jim Williams, begins by stating that "President Young has requested that I respond to your letter of October 25, 2005 concerning the removal from the Postal Service which was issued in 2001." (Letter from Williams to Truhlar of November 14, 2005 ("Williams Letter"), Ex. D to Compl.) Williams assured Plaintiff that he had "read your letter closely" but that after discussions with Branch 825 representatives, had concluded that "the Branch decision, while not in your favor, was the correct one." (*Id.*) Williams wrote that its was "clear based on your letter, that you did fill out the [Department of Labor form] CA-7's with incorrect information. The issue in the grievance was whether just cause exists for the charges of falsification . . . . In this case, the Branch determined just cause did exist." (*Id.*) He concluded, "I am sorry about the results of the grievance decision, but the Branch made their decision based upon the case file and did not discriminate in any way I could see." (*Id.*) Plaintiff notes that although Williams' letter states that the NALC supported the "grievance decision," it contains no indication of when any "grievance decision" had been made. (Compl. ¶ 11.)

Significantly, Plaintiff's complaint contains no reference to his "letter of October 25, 2005" to which Williams was responding. Instead, Branch 825 presents it to the court as an exhibit to its motion to dismiss. (Truhlar Letter, Ex. 2 to Branch 825 Mem.) In the letter, addressed to NALC President William Young, Plaintiff asks Young for an "explanation of my status." (*Id.*) Plaintiff provided background information concerning his mail truck accident and his musical activities, and denied that he had improperly completed CA-7 forms. (*Id.*) After protesting that the U.S. Attorney

had been investigating him for "nearly 5 years" and insisting that he did not "try to defraud [the] government," Plaintiff wrote the following:

> To date I have spent nearly ten thousand in attorney fees defending my innocence. My union's response (Branch 825) when this happened was, "there is nothing we could do for you", and in several attempts to contact them they never returned my calls.  On October 17, 2005 I finally spoke with Eric Smith of Branch 825 who informed me and I quote "It's a done deal since they were not going to press charges against me, and that this was settled over three years ago" when I asked if the Union could do anything else for me he replied "NO."

(*Id.* (emphasis in original).)

Plaintiff filed an unfair labor practice ("ULP") charge (the "ULP Charge") against Branch 825 with the National Labor Relations Board ("NLRB") on December 29, 2005.  (ULP Charge, Ex. 3 to Branch 825 Mem.)  In the ULP Charge, Plaintiff asserted that "[s]ince on or about October 17, 2005, [Branch 825] has failed and/or refused to file a grievance on behalf of [Plaintiff] over his termination, for arbitrary, discriminatory, and/or capricious reasons."  (*Id.*)  In a letter decision dated February 28, 2006 (the "NLRB Letter"), the NLRB dismissed the charge, finding the evidence insufficient to show that Branch 825 did not "process your grievance . . . fairly."[7]  (*Id.*)

Plaintiff filed suit against Branch 825 and the USPS on April 21, 2006.  He brings a "hybrid" claim under Section 301 of the LMRA, 29 U.S.C. § 185, *see DelCostello v. Int'l Bhd. Of Teamsters*, 462 U.S. 151, 165 (1983), alleging that Branch 825 violated its statutory duty of fair representation ("DFR") and that the USPS breached the collective bargaining agreement by terminating him without just cause.  (Compl. ¶¶ 1, 13-14.)  Specifically, Plaintiff "denies, and has always denied that he ever failed to disclose information required of him on Form CA-7."  (*Id.* ¶ 10.)  He asserts that Branch 825 had "previously supported [his] position" by pursuing the November 2001 grievance and reaching the Grievance Settlement, but that the Union has not "indicated why they . . . now have refused to further pursue the 2001 grievance or a new grievance on Plaintiff's behalf."  (*Id.* ¶¶ 10,

---

[7]    Plaintiff contends that the NLRB materials, attached to Branch 825's motion, are not appropriately considered on a motion to dismiss; as explained below, the court disagrees.

12.)  He contends that Branch 825's decision "to not pursue the grievance . . . was arbitrary, unreasonable, and capricious," (*id.* ¶ 13), and further alleges that Branch 825 "conspired with the [USPS] to permit Plaintiff's discharge to stand, although there was no just cause," and that "the 2001-2002 negotiations between [Branch 825 and the USPS] were spurious, carried on in bad faith," and designed to give Plaintiff the false impression that Branch 825 was making a sincere effort to resolve the grievance.  (*Id.* ¶ 14.)  Plaintiff seeks reinstatement and damages including, *inter alia*, back pay.  (*Id.* ¶ 15.)

## DISCUSSION

Defendants have moved to dismiss Plaintiff's complaint, pursuant to FED. R. CIV. P. 12(b)(6), for failure to state a claim upon which relief can be granted.  The purpose of a Rule 12(b)(6) motion is to test the sufficiency of the plaintiff's complaint, not to decide its merits.  *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990).  When considering such a motion, the court accepts all well-pleaded allegations in a claim as true and draws all reasonable inferences in favor of the plaintiff.  *See Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 977-78 (7th Cir. 1999).  The court will grant the motion only "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which entitles him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

Defendants contend that Plaintiff's claims are barred by the applicable six-month statute of limitations.  The court notes that because the statute of limitations is an affirmative defense, Plaintiff "need not anticipate or attempt to defuse" that defense in his complaint.  *See U.S. Gypsum Co. v. Ind. Gas Co.*, 350 F.3d 623, 626 (7th Cir. 2003); *see also United States v. N. Trust Co.*, 372 F.3d 886, 888 (7th Cir. 2004) (deeming it "irregular" to dismiss a claim as untimely under Rule 12(b)(6)).  Dismissal is appropriate only when the plaintiff pleads himself out of court by "admit[ting] all the ingredients of an impenetrable defense[,]" *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004), "such as when a complaint plainly reveals that an action is untimely . . . ." *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005).

Defendants argue that test is met here. A suit bringing a "hybrid" claim pursuant to Section 301 of the LMRA, combining a DFR claim with a claim for breach of a collective bargaining agreement, must be filed within six months of the date on which the cause of action accrued. *See DelCostello*, 462 U.S. at 154-55, 172 (statute of limitations applicable to hybrid Section 301 claims is six-month period borrowed from Section 10(b) of National Labor Relations Act, 29 U.S.C. § 10(b)). The cause of action accrues "from the time a final decision on a plaintiff's grievance has been made or from the time the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, that no further action would be taken on his grievance." *Chapple v. Nat'l Starch and Chem. Co.*, 178 F.3d 501, 505 (7th Cir. 1999) (quotation marks and citations omitted). According to Defendants, Plaintiff's cause of action accrued on October 17, 2005, when, Defendants maintain, he learned from Smith that Branch 825 would take no further action on Plaintiff's November 2001 grievance. (Branch 825 Mem., at 5.) As Plaintiff did not file suit until April 21, 2006, Defendants contend this action is untimely.

Defendants' argument relies, however, on documents attached to their briefs but which were not attached to Plaintiff's complaint, in particular the October 25, 2005 Truhlar Letter, which recounted Plaintiff's conversation with Smith, and the ULP Charge. As noted, Plaintiff moves to strike these materials as inappropriately considered on a Rule 12(b)(6) motion. (Motion to Strike (34).) If the court does consider these materials, Plaintiff urges, then the court must convert Defendants' motions into motions for summary judgment; upon such conversion, Plaintiff argues, the court must either deny the motions upon consideration of the affidavits and other materials that Plaintiff has attached to his opposition brief,[8] or permit discovery concerning Defendants' statute of limitations defense pursuant to Rule 56(f). (Pl.'s Resp., at 8.) For their part, Defendants maintain

---

[8]     Plaintiff submits his own affidavit, the affidavit of the Branch 825 Union Steward, an affidavit from his attorney, and, as noted, excerpts from the current National Agreement and other NALC materials downloaded from NALC's web page. (Ex. 1-4 to Pl.'s Resp.)

that all the materials attached to their motions can properly be considered without converting those motions into motions to for summary judgment, and object that Plaintiff's attempt to "unilaterally convert" Defendants' motions by attaching self-authored affidavits constitutes an improper effort to plead additional facts.  (Branch 825 Reply, at 2-4.)  As a preliminary matter, therefore, the court determines whether those materials are properly considered for purposes of a Rule 12(b)(6) motion, or whether the court must convert Defendants' motions into motions to for summary judgment.

## I.    Consideration of Extraneous Materials and/or Conversion to Summary Judgment

Rule 12(b) limits the scope of materials that a court can consider in deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim: "If . . . matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56."  FED. R. CIV. P. 12(b).  The Seventh Circuit has explained that "Rule 12(b) is mandatory; consequently, if documents outside of the pleadings are placed before a district court, and not excluded, the court must convert the defendant's 12(b)(6) motion to one for summary judgment and afford the plaintiff an opportunity to submit additional evidentiary material of his or her own."  *Venture Assoc. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir.1993).  Acceptance of the extraneous material is discretionary, however, not mandatory; therefore, "[o]nly if the court accepts the additional material is the motion then treated as one for summary judgment."  *Cole v. World Wrestling Fed'n*, 155 F.R.D. 27, 28 (N.D.N.Y. 1994); *see also* 5C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1366 (3d Ed. 2004) ("As the language of the rule suggests, federal courts have complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.").  Thus, where a defendant attaches materials to a Rule 12(b)(6) motion, the court may, at its discretion, either convert the motion into a motion for summary judgment and proceed in accordance with Rule 56, or exclude the materials and continue under

Rule 12. *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998); *DeLeon v. Beneficial Const. Co.*, 998 F. Supp. 859, 862 (N.D. Ill. 1998) (noting that "The decision on which course to choose . . . is entirely within the court's discretion[,]" excluding all materials attached to defendants' Rule 12(b)(6) motions, and continuing to proceed under Rule 12).

Certain matters may, however, be treated as part of the pleadings, and their consideration by the court may not require conversion of a Rule 12(b)(6) motion into one for summary judgment. Specifically, "documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim." *Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994) (citing *Venture*, 987 F.2d at 431). These documents may properly be considered on a motion to dismiss without converting the motion into a motion for summary judgment. *Id.* The Seventh Circuit has cautioned that this constitutes a "'narrow exception' to the general rule" that consideration of extraneous material requires conversion, *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002) (quoting *Levenstein*, 164 F.3d at 347), and is "aimed at cases interpreting, for example, a contract." *Levenstein*, 164 F.3d at 347; *see Tierney v. Vahle*, 304 F.3d 734, 739 (7th Cir. 2002) (explaining that "the scope of the exception . . . is uncertain; perhaps it is or should be limited to cases in which the suit is on a contract or the plaintiff, if he has not attached, has at least quoted from, the document later submitted by the defendant").

Another "narrow exception" to the conversion rule allows the court to take judicial notice of matters in the public record, including materials from proceedings in other courts and administrative agencies, without converting a Rule 12(b)(6) motion into a motion for summary judgment. *See Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997) (collecting cases); *Opoka v. INS*, 94 F.3d 392, 394 (7th Cir. 1996) (decisions from other courts and administrative agencies proper subject of judicial notice); *Henson v. CSC Credit Servs.*, 29 F.3d

280, 284 (7th Cir. 1994) (district court properly considered public court documents from prior state court litigation in deciding defendants' motion to dismiss for failure to state a claim).

Here, Branch 825 attaches four exhibits to its motion to dismiss: the November 2001 Notice (Ex. 1 to Branch 825 Mem.), the Truhlar Letter of October 25, 2005 (Ex. 2), the ULP Charge (Ex. 3), and the NLRB Letter (Ex.4). Branch 825 authenticates these exhibits with the declaration of Eric Smith, also attached to Branch 825's motion; Smith identifies himself as Vice-President of Branch 825 since 1990. (Declaration of Eric Smith ("Smith Decl.") ¶ 1, Ex. to Branch 825 Mem.) The USPS attaches only the Truhlar Letter and the ULP Charge. (Ex. 1 & Ex. 2 to Defendant United States Postal Service's Memorandum in Support of Dismissal.) Defendants contend that consideration of these documents does not require conversion of their Rule 12(b)(b) motions into motions for summary judgment because the materials are either part of the pleadings, or are matters of public record. The court addresses these materials in turn.

### A. The November 2001 Notice

As noted, Plaintiff attached to his complaint the grievance worksheet that Branch 825 filed on his behalf, (NALC Grievance Worksheet, Ex. A to Compl.), but did not attach the November 2001 Notice upon which the grievance was based. The grievance worksheet, however, contains a check mark in a box labeled "Additional Sheet Attached." (*Id.*) Citing to Smith's declaration, Branch 825 asserts that this "additional sheet" was the November 2001 Notice; Smith indeed states that the November 2001 Notice was attached to the November 11, 2001 grievance worksheet and that the copy of that document attached to Branch 825's motion is true and accurate. (Smith Decl. ¶¶ 3-4.) Branch 825 contends that the November 2001 Notice thus merely completes the document attached by Plaintiff, and that the court can therefore consider its contents without requiring conversion to summary judgment. The court agrees that the November 2001 Notice, because it was originally attached to the grievance worksheet attached to Plaintiff's complaint, and because the complaint itself specifically refers to it, (Compl. ¶ 7), can properly be considered part of the

pleadings. *See Caraluzzi v. Prudential Secs., Inc.*, 824 F. Supp. 1206, 1210 n.1 (N.D. Ill. 1993) (citing *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)) (where plaintiff attached monthly client statements from defendant brokerage firm to complaint, consideration of additional client statements attached to defendant's motion to dismiss did not require conversion to summary judgment, as defendant's materials "represent the complete documents incorporated by reference in plaintiffs' complaint").

### B.    The ULP Charge and the NLRB Letter

Defendants contend that both the ULP Charge and the NLRB Letter, as public records, are properly before the court on a motion to dismiss. Again, the court agrees. As noted, a court may take judicial notice of matters in the public record, including materials from proceedings in administrative agencies, without converting a Rule 12(b)(6) motion into a motion for summary judgment. *See Gen. Elec. Capital Corp.,* 128 F.3d at 1080 (collecting cases); *Opoka*, 94 F.3d at 394 (decisions of administrative agencies proper subject of judicial notice). Moreover, this court has already denied, with respect to the ULP Charge, Plaintiff's motion to strike the materials attached to Defendants' Rule 12(b)(6) motions. *See* Order of 11/16/2006 (denying Plaintiff's Motion to Strike (34) as to the ULP charge, and entering and continuing the motion "as to the correspondence").

### C.    The Truhlar Letter

Defendants' statute of limitations defense relies to a large extent on the court's consideration of the October 25, 2005 letter from Plaintiff to NALC President Young. Defendants contend[9] that the Truhlar Letter is properly before the court because the November 14, 2005 letter to Plaintiff from NALC Executive Vice President Williams "explicitly references" Plaintiff's October 25 letter and was written in response to it. (Branch 825 Mem., at 3 n.2.) Arguing that the Truhlar

_____

[9]    For the most part, the USPS and Branch 825 advance the same arguments in support of their motions; Branch 825's arguments are somewhat more extensive.

Letter "is not rendered inadmissible by [Plaintiff's] failure to attach it to his Complaint," Defendants maintain that the court can consider the document without converting Defendants' Rule 12(b)(6) motions into motions for summary judgment. (Branch 825 Reply, at 3.)

As noted, under an exception to the general rule that consideration of documents attached to a motion to dismiss requires conversion to summary judgment, such documents "are considered part of the pleadings," and therefore may properly be considered without conversion, "if they are referred to in the plaintiff's complaint and are central to his claim." *Wright*, 29 F.3d at 1248 (citing *Venture*, 987 F.2d at 431). Although there is no precise test for what makes a document "central to" a claim, courts typically apply this exception where a claim arises from a contract or other written agreement between the parties, but the plaintiff neglected to attach all or certain relevant parts of that writing to the complaint, and where the complaint repeatedly refers to that writing. *See, e.g., id.* (district court properly considered parties' written agreement, attached to defendants' motion to dismiss, where agreement was "central to" plaintiff's § 1983 claim because it allegedly granted the property interest at the heart of his due process claim, and plaintiff's complaint repeatedly quoted from and referred to that agreement); *Venture*, 987 F.2d at 431-32 (district court in breach of contract suit properly denied plaintiff's motion to exclude letter of intent and related documents attached to defendant's motion, all of which were referred to in the complaint and "constitute[d] the core of the parties' contractual relationship").

The court concludes that the Truhlar Letter does not fit within the exception. First, Plaintiff's complaint nowhere refers to that letter, let alone "repeatedly." *Cf. Wright*, 29 F.3d at 1248; *Steigmann v. Democratic Party of Ill.*, 406 F. Supp. 2d 975, 986 (N.D. Ill. 2005) (Plaintiff referred to employment contracts and job descriptions "at least sixteen times in his complaint"). Nor does the letter appear "central to" Plaintiff's claim: unlike a contract or other written agreement, the Truhlar Letter does not reflect or even relate to the rights and duties of the parties, from which Plaintiff's claim arises. *Cf. Venture*, 987 F.2d at 431-32; *see also Levenstein*, 164 F.3d at 347

("narrow exception" to conversion rule "aimed at cases interpreting, for example, a contract"). Indeed, the Truhlar Letter is entirely incidental to Plaintiff's hybrid DFR/breach of the collective bargaining agreement claim. Defendants ask the court to consider it because it happens to contain statements indicating, according to Defendants, that Plaintiff's claim is barred by the statute of limitations; in that sense, it is "central" not to Plaintiff's claim, but to Defendants' affirmative defense. The court is aware of no authority holding that consideration of extraneous material on a motion to dismiss is proper on that basis.

Branch 825 fails even to address the requirement that materials attached to a motion to dismiss must be "central to" a plaintiff's claim; instead, citing *Magellan Int'l Corp. v. Salzgitter Handel*, 76 F. Supp. 2d 919, 923 (N.D. Ill.1999), Branch 825 contends that the court can consider the Truhlar Letter merely because the Williams Letter, which was attached to the complaint, was written in response to the Truhlar Letter and refers to the Truhlar Letter. In *Magellan*, a breach of contract suit between a steel distributor and a steel trader, the parties "corresponded no fewer than 16 times within a two-month time span" in an attempt to negotiate an agreement; the plaintiff attached seven items of that correspondence to its complaint, and the defendant attached the remainder to its motion to dismiss. 76 F. Supp. 2d at 922-23. Rejecting the plaintiff's argument that the court was thereby required to convert the defendant's Rule 12(b)(6) motion into a motion for summary judgment, the court held that it could properly consider the additional materials:

> When parties engage in a chain of correspondence relating to a transaction within a short period of time, and then one party detaches and presents only certain links of the chain in its effort to state a claim for relief, the party against whom such an incomplete picture is painted is entitled to fill in the skeletal outline thus presented by the complaining party by adding the missing links.

*Id.* at 923 (citing FED. R. EVID. 106 as the "rule of completeness").

*Magellan* is inapposite here. Plaintiff engaged in no "chain of correspondence relating to a transaction" with Williams; so far as the record now before the court shows, Plaintiff wrote just one letter, which was in fact addressed to NALC President Young, and Williams responded on behalf

of Young. The mere fact that Williams acknowledged that Plaintiff sent a letter does not transform Plaintiff's complaint into a "skeletal outline" that paints an "incomplete picture" unless the court considers the Truhlar Letter. Furthermore, this is not a contract suit, and Plaintiff's letter to Young did not "relat[e] to a transaction" from which Plaintiff's claim arises; as noted, the exchange with Williams, of which the Truhlar Letter is a part, is in no way "central to" Plaintiff's claim.

The court concludes that because Plaintiff's complaint did not refer to the Truhlar Letter even once, and because that document is not "central to" Plaintiff's claim in any event, the Truhlar Letter cannot be considered "part of the pleadings"; therefore, the court can consider its contents only by converting Defendants' Rule 12(b)(6) motions into motions for summary judgment. *See Venture*, 987 F.2d at 431-32 (conversion mandatory if court considers matters outside pleadings). The court thus has two options: either exclude the Truhlar Letter and proceed under Rule 12 by considering only the complaint and the remaining materials attached to Defendants' motions, which are properly before the court; or convert Defendants' motions and proceed in accordance with Rule 56, in which case the court would consider the Truhlar Letter as well as the affidavits and other evidence that Plaintiff attaches to his opposition brief. *See Levenstein*, 164 F.3d at 347 (noting court's discretion to either exclude extraneous materials and continue under Rule 12 or convert motions to Rule 56 summary judgment motions).

The court chooses the first option. Significantly, it is Plaintiff, not Defendants, who seeks conversion to summary judgment; Defendants argue only that the Truhlar Letter is part of the pleadings, and make no alternative request for the court to convert their motions and consider the Truhlar Letter on that basis.[10] This is not the typical posture for a request for conversion to summary judgment. *See Magellan*, 76 F. Supp. 2d at 922 (noting that conversion to summary

---

[10] In its reply brief, Branch 825 reiterates that "Defendants' motions are properly considered as motions to dismiss," and contends that Plaintiff has improperly attempted to convert those motions into motions for summary judgment by submitting additional evidence. (Branch 825 Reply, at 4.)

judgment is "ordinarily considered at the instance of a moving defendant, not a responding plaintiff," and "seldom makes sense at the threshold state of any litigation"). Indeed, Plaintiff's insistence that the court convert Defendants' motions—and Defendants' failure to make any such request—is puzzling. Plaintiff apparently (and not without reason) fears that the Truhlar Letter would bolster Defendants' statute of limitations defense; thus, Plaintiff vehemently urges the court not to consider that document, and requests the opportunity, via conversion to summary judgment, to counter it with additional evidence in the event the court does consider it. But Defendants' argument in favor of consideration of the Truhlar Letter rested, as noted, on the court deeming that document part of the pleadings. If the court had agreed, conversion would thus be inappropriate, for conversion is required only upon consideration of matter "outside the pleadings." *See* FED. R. CIV. P. 12(b); *Magellan*, 76 F. Supp. 2d at 922 (conversion requirement "[did] not come into play" because correspondence attached to defendant's motion "not really 'matters outside the pleading'"). As the court is not persuaded by Defendants' argument, the court can simply disregard the Truhlar Letter and decide Defendants' motions under Rule 12 on the basis of the complaint and those extraneous materials that are, as explained above, properly considered. Those documents do not by themselves establish Defendants' defense. At this stage, then, consideration of the Truhlar Letter through conversion to summary judgment would benefit only Defendants, who do not seek it.

The court might nonetheless grant Plaintiff's conversion request—harmful to Plaintiff's self-interest as it may be—if consideration of the Truhlar Letter would likely facilitate the disposition of this litigation. *See Carione v. United States*, 368 F. Supp. 2d 186, 191 (E.D.N.Y. 2005) (court generally exercises discretion to convert Rule 12(b)(6) motion on basis of whether consideration of extraneous material "'is likely to facilitate the disposition of the action'") (quoting CHARLES ALAN WRIGHT & ARTHUR R. MILLER, *supra*); *Estate of Conner v. Ambrose*, 990 F. Supp. 606, 619 (N.D. Ind. 1997) ("The court considers whether proffered, extra-pleading material and actual conversion will likely facilitate disposition of [the] action."); *see also Magellan*, 76 F. Supp. 2d at 923 ("it would

be totally wasteful to uphold a claim on the false premise created by less than complete documentation when the delayed consideration of the remaining documents would lead to dismissal of that claim.")  Contrary to Defendants' view, however, the Truhlar Letter would not conclusively establish Defendants' statute of limitations defense.  Defendants rely on a passage in that letter in which Plaintiff, after complaining about the U.S. Attorney's investigation, recounted a conversation he had with Branch 825's Smith on October 17, 2005.  Because this passage is at the heart of Defendants' defense, the court again presents it here:

> To date I have spent nearly ten thousand in attorney fees defending my innocence. My union's response (Branch 825) when this happened was, "there is nothing we could do for you", and in several attempts to contact them they never returned my calls.  On October 17, 2005 I finally spoke with Eric Smith of Branch 825 who informed me and I quote "It's a done deal since they were not going to press charges against me, and that this was settled over three years ago" when I asked if the Union could do anything else for me he replied "NO."

(Truhlar Letter, Ex. 2 to Branch 825 Mem.)  According to Defendants, this passage demonstrates that Plaintiff knew on October 17, 2005, that Branch 825 would "take no further action on his grievance."  (Branch 825 Mem., at 5.)  The passage does not, however, contain any reference to the November 2001 Grievance in particular, nor to any other grievance.  Earlier in the letter, Plaintiff stated that Branch 825 "did . . . file a grievance that I was aware of" but that the union told him it was waiting for resolution of the U.S. Attorney's investigation.  (Truhlar Letter, Ex. 2 to Branch 825 Mem.)  The above passage, on the other hand, appears to refer to that investigation and to Branch 825's response "when this happened," rather than to the union's action with respect to any specific grievance.  Similarly, Smith's alleged "It's a done deal" comment does not explain what "It" referred to; and Smith answered "no" when Plaintiff asked if there was "anything *else*" Branch 825 could do for him, not whether there was anything the union could do with respect to the November 2001 grievance specifically.  Finally, the fact that Plaintiff sought an "explanation of [his] status" from the President of the NALC suggests that Plaintiff may not have actually known what was happening with the November 2001 Grievance.  Indeed, while Plaintiff recounted in the letter what Smith told

him, he did not state what he understood Smith's comments to mean; that is the crucial fact required for Defendants' statute of limitations defense.

Drawing all inferences in Plaintiff's favor—as the court would do for purposes either of a motion to dismiss or a motion for summary judgment—the letter leaves open the possibility that Plaintiff did not understand Smith to be telling him that Branch 825 would take no further action on the November 2001 grievance. That possibility would foreclose dismissal under Rule 12(b)(6), if the court had granted Defendants' request to consider the Truhlar Letter part of the pleadings. And if the court were to convert Defendants' motions into motions for summary judgment at this time, the Truhlar Letter, standing alone, would not establish the absence of a genuine factual dispute on the issue of when Plaintiff actually knew that his grievance would not be pursued. This is not to say that Defendants would be unable to present a statute of limitations defense at a later stage of this litigation; indeed, while the Truhlar Letter does not establish Plaintiff's knowledge as a matter of undisputed fact, it does constitute persuasive evidence that Plaintiff knew on October 17, 2005 that Branch 825 would take no further action on his November 2001 grievance and would not file any new grievance as well. Further discovery might yield more evidentiary support, and if Plaintiff, upon a subsequent motion for summary judgment from Defendants, is unable to establish a genuine factual dispute on this issue, Defendants' statute of limitations defense might prevail. At this stage, however, the Truhlar Letter, standing alone, is insufficient to establish that defense and entitle Defendants to dismissal.

Because consideration of the Truhlar Letter would thus not facilitate disposition of this action, and because Defendants do not request conversion to summary judgment, the court declines to convert Defendants' Rule 12(b)(6) motions into Rule 56 motions for summary judgment. The court excludes the Truhlar Letter and will determine Defendants' motions, as Rule 12(b)(6) motions, by examining only the complaint and the other materials attached to Defendants' motions.

## II.    Defendants' Statute of Limitations Defense

As noted, the statute of limitations for a "hybrid" claim pursuant to Section 301 of the LMRA is six months, *see DelCostello*, 462 U.S. at 172, and begins to run "from the time a final decision on a plaintiff's grievance has been made or from the time the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, that no further action would be taken on his grievance." *Chapple*, 178 F.3d at 505 (quotation marks and citations omitted). Because Plaintiff filed suit on April 21, 2006, his claim would thus be barred if he knew or should have known by October 21, 2005, that Branch 825 would take no further action on his grievance. Dismissal under Rule 12(b)(6) would be appropriate only if such knowledge was apparent from the face of Plaintiff's complaint and/or the materials properly considered as part of the pleadings, in which case Plaintiff will have pleaded himself out of court. *See Xechem*, 372 F.3d at 901; *Lewis*, 411 F.3d at 842.

Without the Truhlar Letter, which the court excludes from consideration as explained above, nothing in the pleadings suggests that Plaintiff has pleaded himself out of court here. According to the complaint, Plaintiff did not learn that the union would take no action on his behalf until shortly after November 14, 2005, when he received Williams' response to his October 25 letter. (Compl. ¶ 11.) Because Williams referred to "the grievance" and Branch 825's "grievance decision," that letter appears to inform Plaintiff, for the first time, the Branch 825 had, at some unidentified point, decided not to further pursue the November 2001 Grievance. (Williams Letter, Ex. D to Compl.) Nothing else in the complaint suggests that Plaintiff knew before November 14, 2005—well within the six-month limitations period—that the November 2001 Grievance had been dropped.

The only other part of the pleadings that Defendants have cited in support of their defense is the ULP Charge that Plaintiff filed on December 29, 2005, in which Plaintiff stated that "[s]ince on or about October 17, 2005, [Branch 825] has failed and/or refused to file a grievance on behalf of [Plaintiff] over his termination . . . ." Read in the light most favorable to Plaintiff, it is possible that "on or about" could be construed to mean as late as October 21, in which case Plaintiff's action is timely. More significantly, Plaintiff in the ULP Charge accuses Branch 825 of failing to file a *new*

grievance; there is no mention of any alleged failure to pursue the November 2001 Grievance. Indeed, even if the court were to consider the Truhlar Letter, the passage relied on by Defendants, as discussed above, did not mention the November 2001 Grievance. That passage can fairly be read to suggest that Plaintiff understood Smith to be telling him that Branch 825 would take no *new* action on his behalf, as Smith answered "no" when Plaintiff asked if there was "anything *else*" Branch 825 could do for him; this is consistent with Plaintiff's statement in the ULP Charge that Branch 825 had failed or refused to file a grievance over his termination, which, according to the complaint, did not occur until October 2005.

The pleadings thus leave open the possibility that Plaintiff did not know until after November 14, 2005 that Branch 825 would take no further action on the November 2001 Grievance. Because Plaintiff's action is timely under this possibility, Defendants are not entitled to dismissal on the basis of the statute of limitations.[11]

As the court does not rely on the contents of the Truhlar Letter in its disposition of Defendants' Rule 12(b)(6) motions, and thus does not convert those motions into motions for summary judgment, the court need not consider the materials Plaintiff attaches to his opposition brief. Similarly, the court need not reach Plaintiff's alternative arguments, all of which are based

_____

[11] The USPS, citing *Christiansen v. APV Crepaco, Inc.*, 178 F.3d 910 (7th Cir. 1999) and *Stevens v. Northwest Ind. Dist. Council, United Bhd. of Carpenters*, 20 F.3d 720 (7th Cir. 1994), contends that it was not "reasonable" for Plaintiff not to have known on October 17, 2005, in light of what Smith told him, that Branch 825 was no longer pursuing the November 2001 Grievance. (Defendant United States Postal Service's Reply in Support of Dismissal, at 2.) This argument relies, however, on the Truhlar Letter, which is not properly before the court on a motion to dismiss. Moreover, even taking that document into account, the cited cases are distinguishable. Although *Christiansen* found the plaintiff's DFR claim untimely because she reasonably should have become aware of her union's 1991 decision not to file a grievance well before she filed suit in 1997, that case was decided on a motion for summary judgment, not a motion to dismiss; moreover, because the collective bargaining agreement mandated that grievances be brought within seven days, the plaintiff should have known that the union's failure to do so in 1991 constituted a final decision at that time. 178 F.3d at 914. That is not the case here, where Branch 825 in fact filed a grievance in 2001, but Plaintiff was unaware of its status. *Stevens* did not involve this issue at all, but rather held that the statute of limitations is not tolled by repeated appeals once the union has responded to an appeal in a clear manner. 20 F.3d at 730.

on those additional materials: that the statute of limitations did not begin to run until the fourteen-day period for filing a new grievance under the National Agreement had expired; that he did not learn that the November 2001 Grievance was no longer pending until a meeting with Branch 825 officials on October 26, 2001; or that the statute of limitations had been tolled while Plaintiff pursued internal union appeals. These arguments, as well as Defendants' statute of limitations defense, may be relevant after development of a more extensive factual record.

Finally, the court notes that at this stage of the litigation, the facts as represented by the complaint and the materials that both parties have submitted raise more questions than they answer. It is unclear, for example, whether Plaintiff was terminated in 2001 and then "re-terminated" in 2005, or indeed what his employment status was between 2001 and 2005. The court also questions why, if the 2002 Grievance Settlement stayed action on Plaintiff's November 2001 Grievance pending resolution of the U.S. Attorney's investigation, the fact that the U.S. Attorney decided in July 2005 not to pursue criminal charges did not result in renewed efforts by Branch 825 on Plaintiff's behalf. Furthermore, and most significantly for purposes of Defendants' statute of limitations defense, there is as yet scant evidence concerning what Plaintiff understood about the status of the November 2001 Grievance after his October 17, 2005 conversation with Smith. In light of these unanswered questions, dismissal of Plaintiff's complaint on motion is inappropriate.

## CONCLUSION

For the reasons explained above, Defendant USPS's motion to dismiss (14) and Defendant Branch 825's motion to dismiss (16) are denied. Plaintiff's motion to strike (34) is denied as moot. Defendants are directed to answer the complaint on or before April 20, 2007. A Rule 16 conference is set for May 3, 2007, at 9:00 a.m.

ENTER:

Dated: March 30, 2007

22

REBECCA R. PALLMEYER
United States District Judge