**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| KENNETH T. TRUHLAR, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 06 C 2232 |
| ) | |
| JOHN GRACE BRANCH #825 of the ) | Judge Rebecca R. Pallmeyer |
| NATIONAL ASSOCIATION OF ) | |
| LETTER CARRIERS, and THE UNITED ) | |
| STATES POSTAL SERVICE, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

On November 2, 1998, Plaintiff Kenneth Truhlar, a letter carrier with Defendant United States Postal Service ("USPS"), was rear-ended in a USPS vehicle while delivering mail. The following day, Truhlar filed a claim for workers' compensation and began working shorter days. Periodically, he was required to complete a form confirming his continuing need for partial disability payments. One of the fields on the form asked: "Have you worked outside your federal job during the period [for which you are claiming disability]?" On at least twenty-four forms completed from 2000 through the summer of 2001, Truhlar answered this question "No" or left it blank. In fact, however, during much of this time, Plaintiff was performing in a band, activity that generated around $11,000 in income. Plaintiff claims that he was not actively trying to conceal this activity and that he honestly believed that the money he earned from the band's performances did not need to be reported on the form. Nevertheless, USPS initiated an investigation in the summer of 2001, and ultimately concluded that Plaintiff acted improperly by failing to report income on the government form. As a result, Plaintiff was issued a notice of removal on November 9, 2001.

Plaintiff filed grievances with his local union, Defendant John Grace Branch # 825 ("Branch 825" or "the Branch") of the National Association of Letter Carriers ("NALC"), protesting the notice of removal and other personnel actions taken by USPS in the summer and fall of 2001. In February 2002, the Branch and USPS agreed to hold Plaintiff's grievances in abeyance pending the outcome

of a criminal investigation initiated by the United States Attorney's Office. In the summer of 2005, USPS learned that the U.S. Attorney had declined to prosecute Plaintiff, but concluded that Plaintiff's actions provided just cause for termination. Based on the evidence available at the time, Branch 825 agreed, and Plaintiff was terminated effective in fall 2005. The union declined to consider reopening the matter, even after the Employee's Compensation Appeals Board at the Department of Labor ("DOL") overturned a previous DOL decision and ruled that Plaintiff was not required to pay back the money he received while on partial disability.

Plaintiff filed suit against both the union and USPS, alleging that the former violated its duty to fairly represent his interests and the latter breached the collective bargaining agreement ("CBA") in place between NALC and USPS. Both Defendants moved for summary judgment. For the reasons given below, both motions are granted.

## **FACTS**

Truhlar began working for USPS in 1984 as a letter carrier in Westmont, Illinois. (825 56.1 ¶ 1.) On November 2, 1998, Plaintiff was rear-ended by another car while delivering mail on his route. (Investigative Memo. at 1, Ex. 64 to Pl.'s Mem.) The next day, Plaintiff filed a claim with DOL for partial disability payments. (825 56.1 ¶ 4.) Although the details of his work schedule are disputed, the parties agree that Plaintiff began working a reduced schedule after DOL accepted his claim, and that by November 2000, Plaintiff was working an average of four hours per day while continuing to receive partial disability payments. (Pl.'s Ans. to 825 56.1 ¶ 5.) In order to continue receiving these payments, DOL required Plaintiff to periodically complete a Form CA-7 "Claim for Compensation." (825 56.1 ¶ 6.) One of the questions on the CA-7 asked: "Have you worked outside your federal job during the period [for which you are claiming disability]?" (*Id.*) On at least twenty-four CA-7 forms submitted by Plaintiff, he either left that field blank or answered "no." (*Id.* ¶ 7.) During 2000 and 2001, however, Truhlar earned approximately $11,000 as a bass guitarist in the rock band, "Bang." (*Id.* ¶ 9.) Plaintiff also received $10,594.25 in disability compensation

from DOL during this time. (*Id.*)

In the summer of 2001, the United States Postal Inspection Service (the "Inspection Service") began an investigation of Plaintiff's disability claim. (*Id.* ¶ 8.) On June 27, 2001, following an interview with Truhlar concerning his income from the band, Postal Service Supervisor William Blaha placed Truhlar on emergency off-duty status, stating in a letter, "Your explanation about offsetting expenses and misunderstanding the form are unacceptable and your actions are inappropriate. Therefore you are placed in this status because retaining you on duty may result in loss of funds." (USPS 56.1 ¶ 4.) On July 12, Branch 825 filed a grievance on Plaintiff's behalf. (*Id.* ¶ 5.) The Inspection Service's investigation culminated in the issuance of an Investigative Memorandum on September 4, 2001, which concluded that Plaintiff "failed to report his outside employment and the subsequent income to the U.S. Department of Labor." (Investigative Memo. at 1, Ex. 64 to Pl.'s Mem.) The Memorandum relied, in part, upon a document prepared by Candace Vucsko, a Human Resource Specialist at USPS. In a "Memo to File" dated February 5, 2001, Vucsko wrote that she had a conversation with Truhlar in which she informed him that he needed to complete several parts of the CA-7, including the provision about outside income. (*Id.* at 2.) According to Vucsko's memo, Truhlar told her about a recording studio that he owned and said that he wrote and published songs; Vucsko warned that any earnings from those activities had to be reported on the form, but Truhlar assured her that he did not make any money from those activities. (*Id.*) The memo does not specifically mention Truhlar's participation in a band. At some unspecified point,[1] the U.S. Attorney's Office began an investigation into Truhlar's claims on the CA-7 forms. (825 56.1 ¶ 10.) On September 28, Westmont Postmaster Gary Reece met with Truhlar

---

[1] Branch 825 claims that the investigation began after issuance of the Investigative Memorandum. (825 56.1 ¶ 10.) Plaintiff is correct that the evidence Branch 825 relies on in support of the assertion—the declaration of its vice president, Eric Smith—is insufficient, as Smith lacks foundation to support his statement regarding when the investigation began. (Pl.'s Ans. to 825 56.1 ¶ 10.) The court further notes evidence in the Investigative Memorandum itself that the Inspection Service worked with an Assistant U.S. Attorney while investigating the charges against Truhlar, suggesting the U.S. Attorney's Office began its investigation prior to the issuance of the Investigative Memorandum. (Investigative Memo. at 3, Ex. 64 to Pl.'s Mem.)

3

and his union representative to inquire about Truhlar's failure to report the outside income; on the advice of counsel, Truhlar chose not to respond to the questions. (USPS 56.1 ¶ 6.)

On November 9, 2001, USPS issued a "Notice of Removal" to Plaintiff, advising him that his termination would become effective no sooner than thirty days later. (*Id.* ¶ 7.) The Notice identified four provisions of the Employee and Labor Relations Manual ("ELM") that Plaintiff had violated: 661.3 Standards of Conduct ("Employees must avoid any action . . . which might result in or create the appearance of . . . affecting adversely the confidence of the public in the integrity of the Postal Service"); 661.53 Unacceptable Conduct ("No employee will engage in criminal, dishonest . . . or immoral conduct"); 666.2 Behavior and Personal Habits ("Employees are expected to conduct themselves during and outside of working hours in a manner which reflects favorably upon the Postal Service"); and 666.3 Loyalty ("Employees are expected to be loyal to the government and uphold the policies of the Postal Service"). (*Id.* ¶ 8.) Truhlar requested that the union file another grievance on his behalf, and Branch 825 did so on November 21. (*Id.* ¶ 9.) In yet another grievance filed that fall, the union challenged a "Letter of Demand" in which USPS demanded that Truhlar repay $227.80 in health care coverage that USPS believed it should not have paid. (Grievance Worksheet, Ex. 81 to Pl.'s Mem.)

Under the grievance procedure that governed Plaintiff's grievances,[2] a grievant could initiate a grievance at Step 1 and, if the grievance is not resolved by USPS, the Branch could appeal to Step 2. (825 56.1 ¶ 16.) If the grievance is not resolved at Step 2, the Branch could then appeal to Step 3, at which point the matter would be handled by the national union, and an unfavorable

---

[2] The parties dispute whether the 1998-2001 CBA or 2001-2006 CBA governed Plaintiff's claims, and also dispute the significance of the differences in the grievance procedure between the two CBAs. (Pl.'s Ans. to 825 56.1 ¶¶ 15, 17.) Plaintiff did not, however, dispute that, at least the "Step 1, Step 2" terminology of the 1998-2001 CBA governed Plaintiff's claims (*id.* ¶ 18), and that the "Grievance Settlement" forms in 2005 confirm that the claim was handled pursuant to the numerical "step" framework. (Grievance Settlement, Exs. 57-59 to Pl.'s Mem.) The union maintains that both CBAs applied at various times during the four years that the grievances were pending. (825's Resp. to Pl.'s 56(b)(3) ¶ 1.) While a precise time line is impossible to trace from this record, the court agrees with the union that the choice of the applicable CBA is not material to Plaintiffs' claims. (*Id.*)

outcome at this stage could then be appealed to arbitration. (*Id.*) In Truhlar's case, USPS denied his grievance at Step 1. (*Id.* ¶ 18.) After the Branch appealed his grievances to Step 2, USPS gave Eric Smith, the Branch vice-president, a copy of the Investigative Memorandum and told Smith that the U.S. Attorney's Office had criminally charged Truhlar. (*Id.* ¶ 20.) This was not accurate: Truhlar had not in fact been charged. The Branch and USPS nevertheless signed "Grievance Settlement" forms on February 25, 2002, agreeing to hold the grievances in abeyance "pending disposition of charges brought against [Truhlar] by the office of the United States Attorney on a related matter." (*Id.* ¶ 21.) The forms contain no reference to the DOL investigation (Grievance Settlement, Ex. G to Smith Decl., Attach to 825 56.1), but some evidence suggests the pending DOL proceedings were an independent basis for the decision to stay the resolution of the grievances. (Grievance Settlement, Exs. 57-59 to Pl.'s Mem; Anders Dep. 84:8-85:2, Ex. AA to Pl.'s Mem.) The parties also dispute the extent to which Truhlar was involved in the grievances: Smith asserts that Truhlar refused to discuss the grievances with Branch personnel at all, while Truhlar claims that he was never even contacted by the Branch. (Pl.'s Ans. to 825 56.1 ¶ 19.)

The grievances continued to be held in abeyance until the summer of 2005, when Dianne Anders, who became Postmaster at the Westmont facility in May 2005, asked several individuals about the Truhlar grievances. (USPS 56.1 ¶¶ 20-21.) In addition to receiving a copy of the Investigative Memorandum, Anders learned that DOL had denied Plaintiff's appeal of his compensation forfeiture (discussed in more detail below) and that the U.S. Attorney's Office had declined to prosecute Truhlar. (*Id.* ¶¶ 21, 25, 26.) Assistant United States Attorney Michelle Nasser Weiss explained the decision not to charge Plaintiff criminally on the basis that the total dollar amount at issue was low, DOL had ordered Plaintiff to repay the full loss amount, and the Civil Division of the U.S. Attorney's Office was pursuing damages. (Declination Form, Ex. H to Smith Decl., Attach. to 825 56.1.) After discovering this information, Anders set up a meeting with Smith, who, after reviewing the same information, agreed to withdraw Truhlar's grievances. (USPS

5

56.1 ¶ 27.) On September 14, 2005, Smith formally withdrew the grievances. (*Id.* ¶ 28.)

Plaintiff received a Form 50 "Notification of Personnel Action" on October 17, 2005, informing him that his removal became effective September 23, 2005.[3] (*Id.* ¶ 32.) Later that day, Truhlar called Smith to see if he could file a grievance regarding the Form 50, and Smith told him he could not. Truhlar recalls that Smith told him, "You're a done deal. The case has been over years ago. There's nothing—nothing we can do for you." (*Id.* ¶ 33; Truhlar Dep. 159:12-17, Attach. to USPS 56.1.) When Truhlar, upset, responded with profanity, Smith stopped talking. (USPS 56.1 ¶ 33.) On October 25, Truhlar wrote a letter to NALC President William Young in which he recounted his conversation with Smith and asked the national union to intervene on his behalf. (Truhlar Letter, Ex. 30 to Pl.'s Mem.) The next day, Truhlar called Branch 825 President Jay Ricke, who set up a meeting for Truhlar with Smith and another union representative; at the meeting, Truhlar again requested that the union file a grievance over the Form 50 and was again told that the union could not do so and that "it was a done deal." (USPS 56.1 ¶ 35.) On November 14, NALC executive vice president Jim Williams responded to Truhlar's letter and informed him that the national union would not intervene on his behalf because "the Branch determined just cause did exist . . . [and] the Branch made their decision based upon the case file and did not discriminate in any way I could see." (Williams Letter, Ex. 22 to Pl.'s Mem.)

At the same time the USPS grievance process and the U.S. Attorney's Office investigation were underway, the DOL Office of Workers' Compensation Programs ("OWCP") was evaluating Plaintiff's case to determine whether he would be required to forfeit the $10,594.25 he received in disability compensation from March 2000 to June 2001. (Decision of the Hearing Rep. at 1, Ex. 68

---

[3] Plaintiff argues that his termination did not become effective until either September 23 (the date given on the Form 50) or October 5 (the date the Form 50 was processed). (Pl.'s Ans. to USPS 56.1 ¶ 32; Pl.'s Mem. at 11.) Defendants alternately provide September 23 or September 14 (the day the grievances were withdrawn) as the appropriate date. (USPS 56.1 ¶ 32; 825 Reply at 3.) The parties spilled a great deal of ink in their briefs arguing about Plaintiff's actual date of termination, but the precise date has no bearing on any of the issues the court reaches in this opinion. The court therefore declines to determine the precise date of Plaintiff's termination.

to Pl.'s Mem.) In May 2003, DOL found that Plaintiff knowingly omitted his earnings from the CA-7 forms and therefore had forfeited his disability compensation; after a hearing in January 2004 at which Plaintiff testified, on May 12, 2004, DOL affirmed its decision that Plaintiff must repay the $10,594.25. (*Id.* at 4.) Truhlar appealed this decision to the DOL Employee Compensation Appeals Board ("ECAB") in May 2005. (USPS 56.1 ¶ 19.) On January 12, 2006, after Plaintiff's grievances had been withdrawn and he had been terminated by USPS, ECAB overturned DOL's prior decision, concluding that Plaintiff was not required to repay the $10,594.25 because the CA-7 forms "did not reasonably put appellant on notice that he had to report all earnings." (ECAB Decision at 4, Ex. 34 to Pl.'s Mem.) It is undisputed that Truhlar never informed Anders or Smith that he had appealed to ECAB, but Truhlar contends that Anders nevertheless should have known because DOL forwarded a notice of the appeal to USPS. (Pl.'s Ans. to 825 56.1 ¶¶ 41-42.) At any rate, in August 2005, before Anders asked Smith to withdraw Truhlar's grievances, Labor Relations Specialist Anthony Intoe informed Anders that they had "no record" of Truhlar's having appealed the May 2004 DOL decision (USPS 56.1 ¶ 26), and Plaintiff concedes that neither Smith nor Anders had actual knowledge of the appeal. (Pl.'s Ans. to USPS 56.1 ¶ 30.)

Truhlar filed an unfair labor practice charge with the National Labor Relations Board ("NLRB") on December 29, 2005, alleging the Branch failed to file a grievance over his termination. (825 56.1 ¶ 46.) The NLRB dismissed the charge in February 2006, and affirmed the dismissal on April 20, 2006. (*Id.* ¶¶ 47-48.) The next day, Plaintiff filed suit in this court under section 301 of the Labor Management Relations Act of 1947 ("LMRA"), alleging that the Branch violated the duty of fair representation it owed to him and that USPS violated the CBA by terminating him without just cause. On March 30, 2007, the court denied Defendants' motions to dismiss Plaintiff's complaint as untimely. *Truhlar v. John Grace Branch No. 825 of NALC*, 06 C 2232, 2007 WL 1030237 (N.D. Ill. Mar. 30, 2007). Defendants now move for summary judgment.

## **DISCUSSION**

A court will grant a motion for summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). At this stage in the proceedings, the court does not weigh the evidence presented, but merely determines whether any genuine issues exist and require a trial. *See Winters v. Fru-Con Inc.*, 498 F.3d 734, 744 (7th Cir. 2007). The nonmoving party is entitled to all reasonable inferences that can be drawn from the record. *Freeland v. Enodis Corp.*, 540 F.3d 721, 737 (7th Cir. 2008). However, the nonmoving party must also identify, "with reasonable particularity," the evidence on which it relies, and the court need not "scour the record" searching for a genuine issue for trial. *Winters*, 498 F.3d at 744.

I. **Statute of Limitations**

The court first considers Defendants' contention that this action is barred by the statute of limitations. Actions such as this one that are brought under section 301 of the LMRA are subject to a six-month statute of limitations. *Chapple v. Nat'l Starch & Chem. Co.*, 178 F.3d 501, 505 (7th Cir. 1999). For such actions, the statute of limitations begins to run "from the time a final decision on a plaintiff's grievance has been made or from the time the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, that no further action would be taken on his grievance." *Id.* Defendants contend that the statute began to run on October 17, 2005, when Smith allegedly told Truhlar, "You're a done deal. The case has been over years ago. There's nothing—nothing we can do for you." (Truhlar Dep. 159:15-17, Ex. HH to Pl.'s Mem.) Truhlar understood from this conversation that "the local union wasn't going to do anything more for" him. (*Id.* at 152:23-152:1.) Based on these statements by Truhlar, Defendants maintain that Truhlar knew, or reasonably should have known, as of October 17, 2005, that the union had chosen not to pursue his grievance. Plaintiff's action was filed on April 21, 2006, six months and four days

8

later, which Defendants maintain places the entire action outside of the statute of limitations.[4]

Plaintiff advances two arguments to avoid this outcome. First, Truhlar argues that his conversation on October 17 only concerned a request for the Branch to file a grievance over his receipt of the Form 50 and did not relate at all to his past grievances. This argument ignores Plaintiff's own recollection of the conversation between himself and Smith as well as his understanding of that conversation. As noted above, Plaintiff was told that he was a "done deal," language which clearly suggests that his entire case then pending with the union was terminated, not just a new part about which he was calling. Indeed, not only does that language suggest finality to an objective observer, but Plaintiff himself understood that "the local union wasn't going to do anything more for" him. (*Id.*) Plaintiff's October 25 letter to NALC President William Young also confirmed that Plaintiff understood Branch 825's decision to be final, as he recounted that Smith explicitly told him "NO" in response to his question whether the Branch could do anything else to help him. Even though Plaintiff may have initiated the call with Smith to inquire about filing a new grievance, he clearly was informed that his entire case was no longer being pursued, and he clearly understood that this was what he was told as well. The fact that Plaintiff met with more union officials on October 26, who merely reiterated what they had already told him regarding the finality of his case, does not alter what Plaintiff was explicitly told and what he understood on October 17. October 17 remains the appropriate date to mark the beginning of the limitations period.

Plaintiff's second argument is that, regardless of when the limitations period began to run, the statute was tolled while he pursued an internal appeal within the union. The six-month statute of limitations for section 301 actions is tolled while the plaintiff pursues "internal union remedies." *Frandsen v. Bhd. of Ry., Airline and S.S. Clerks, Freight Handlers, Express and Station*

---

[4] The April 21 filing date is one day after the conclusion of the NLRB decision. This apparently is just a coincidence, and Plaintiff wisely does not argue that the NLRB appeal tolled the statute of limitations for this action. *See Brown v. Keystone Consol. Indus., Inc.*, 680 F. Supp. 1212, 1227 n.13 (N.D. Ill. 1988) ("The filing of unfair labor practice charges with the NLRB does not toll or prevent the accrual of a sec. 301 cause of action." (citing *Adkins v. Int'l Union of Elec., Radio & Mach. Workers*, 769 F.2d 330, 335 (6th Cir. 1985))).

*Employees*, 782 F.2d 674, 681 (7th Cir. 1986). According to Plaintiff, his October 25 letter to NALC President Young constituted an appeal that should have tolled the statute of limitations until NALC Executive Vice President Jim Williams responded on November 14, 2005. Defendants note that the CBA does not provide any formal procedure for an appeal up to the national union. Because the cases applying *Frandsen* all relied upon a specific appeals procedure spelled out in the CBA or other document, Defendants contend, Plaintiff's letter does not support tolling under the *Frandsen* rationale. *See, e.g.*, *Christiansen v. APV Crepaco, Inc.*, 178 F.3d 910, 916 (7th Cir. 1999) ("subsequent cases from this circuit clearly limit tolling under *Frandsen* to the pursuit of formal or required internal procedures"). In response, Plaintiff points to the statement of Branch 825's former union steward Juli Muchowski, who asserted that "the national union office had the authority and ability to overrule and/or reconsider any decisions or recommendations of the local union." (Muchowski Aff. ¶ 7, Ex. 20 to Pl.'s Mem.)

Reasonable minds could differ on this issue, but the court agrees with Plaintiff that the statute of limitations period was tolled from October 25 to November 14 while Plaintiff waited to hear back from the national union. The rationale that supports the *Frandsen* rule supports extending it to the circumstances of this case as well. *Frandsen* invoked respect for the "national labor policy of encouraging workers to pursue internal union remedies." *Frandsen*, 782 F.2d at 681. A letter to the national union may not have been contemplated by the CBA, but it was nevertheless a remedy that afforded the possibility of relief without resort to the courts. Significantly, *Frandsen*-style tolling applies even to remedies that are ultimately considered futile, suggesting that plaintiffs should not be put in the difficult position of having to assess the merit or utility of their appeal to internal union procedures. *Id.* Applying this flexible principle to Truhlar's case, tollings should not be limited to appeals processes formally included in the CBA, if the employees understood that appeals are routinely dealt with in a manner not explicitly discussed in the CBA. Accordingly, Plaintiff's October 25 letter appealing to the national body of NALC merits tolling of the statute.

In reaching this conclusion, the court acknowledges that merely continuing a correspondence with the union does not toll the statute. *See Sosbe v. Delco Elecs. Div. of Gen. Motors Corp.*, 830 F.2d 83, 87 (7th Cir. 1987). Here, however, Truhlar made a specific request for assistance to the national union, and NALC was empowered to overrule Branch 825's decision. It appears that the national union itself did not view the letter as "simply a general appeal for help," as Executive Vice President Williams contacted Branch 825 representatives before concluding that NALC would not intervene. *Pantoja v. Holland Motor Exp., Inc.*, 965 F.2d 323, 328 (7th Cir. 1992). Truhlar's case further differs from the general appeals for help discussed in *Sosbe* and *Pantoja* because, as Muchowski's uncontested affidavit averred, "the *proper* method of internally pursuing an appeal of any decision made at the local level would be to contact the national union regarding the decision." (Muchowski Aff. ¶ 9, Ex. 20 to Pl.'s Mem. (emphasis added).) Muchowski further stated that not only was this frequently done while she was union steward, but that the national union "on many occasions overruled the decisions of the local union." (*Id.* ¶ 8.) Unlike the plaintiff in *Sosbe*, Truhlar was not writing a number of letters to various union officials generally pleading for help. He wrote one letter to NALC. This was, thus, not a situation where the plaintiff was attempting to "indefinitely delay resolution of labor disputes merely by bombarding his union with tiresome requests." *Sosbe*, 830 F.2d at 87 (quoting *Dozier v. Trans World Airlines, Inc.*, 760 F.2d 849, 852 (7th Cir. 1985)). In light of Muchowski's statements about the frequency and effectiveness of past appeals to the national union, the court is unwilling to dismiss his letter as simply an informal appeal, despite Plaintiff's failure to identify a specific passage of the CBA contemplating his appeal to NALC.

Indeed, answering this question the other way produces a result contrary to the goal of private resolution of labor disputes: if Plaintiff were required to consider that the statute of limitations was running while he awaited a decision on his letter to NALC—which had the authority to, and often did, reinitiate the grievance process—he may have filed a federal lawsuit prior to a final

decision by NALC. Requiring an employee to initiate court action in these circumstances is inconsistent with federal labor policy generally and the *Frandsen* rule in particular. *See Stevens v. Nw. Ind. Dist. Council, United Bhd. of Carpenters*, 20 F.3d 720, 729 (7th Cir. 1994) (recognizing "the *Frandsen* rationale of encouraging union members to pursue internal remedies"). The court concludes that the statute of limitations was tolled for the three weeks during which Plaintiff awaited a response to his letter, and his suit, initiated just four days outside of the start of the limitations period, is timely.

## II.     Breach of the Collective Bargaining Agreement

While the question as to whether the statute of limitations was tolled by Plaintiff's letter is a close one, the court has no difficulty concluding that Plaintiff's case fails on the merits. To prevail on a "hybrid" section 301 claim against both the union and the employer, the employee must show *both* that the union breached its duty of fair representation *and* that the employer violated the collective bargaining agreement. *Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 368 (7th Cir. 2003). Accordingly, Plaintiff must establish genuine issues of material fact as to both Defendants to avoid summary judgment; if he cannot establish one of the claims, then both must fail. *Id.* ("the claims are interlocking in the sense that neither is viable if the other fails"). Turning to Plaintiff's claim that the USPS violated the CBA, the court concludes that Plaintiff has not established a genuine issue that the USPS did in fact violate the CBA.

Plaintiff argues that USPS violated the CBA because it did not have "just cause" to terminate Plaintiff. (CBA Art. 16.1, Ex. 40 to Pl.'s Mem. ("No employee may be disciplined or discharged except for just cause . . . .").) Whether the facts establish the existence of just cause is a question of law to be decided by the court. *Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1238, 1242 (7th Cir. 1997). The Joint Contract Administration Manual ("JCAM"), a document prepared jointly by NALC and USPS to assist in interpreting the CBA, describes "just cause" as a "provision [that] requires a fair and provable justification for discipline," with "no precise definition" or "rigid rules that

12

apply in the same way in each case." (JCAM at 16-1, Ex. 73 to Pl.'s Mem.) USPS contends that it had "just cause" for giving Plaintiff a notice of removal and ultimately terminating his employment, highlighting several factors that demonstrate the procedural fairness of the decision-making process: the Inspection Service conducted an extensive investigation prior to issuing its reports, including interviewing people with knowledge of the events; Postmaster Reece met with Plaintiff prior to issuance of a notice of removal in an attempt to hear Plaintiff's side of the story; the USPS sent Plaintiff a detailed letter explaining the reasons he was being given a notice of removal; the USPS stayed its disciplinary actions pursuant to an agreement with Branch 825; and new Postmaster Anders inquired about the status of Plaintiff's case prior to asking the union to drop its pending grievances and proceed with Plaintiff's termination.

The JCAM lists six questions that may be useful in determining whether just cause exists. According to the JCAM, a reasonable just cause inquiry should examine: (1) was there a rule and was the employee aware of that rule; (2) is the rule reasonable; (3) is the rule enforced consistently and equitably; (4) was a thorough investigation completed; (5) was the severity of the discipline reasonably related to the infraction; and (6) was the discipline administered in a timely fashion. (*Id.* at 16-3-4; *Jordan v. USPS*, 488 F. Supp. 2d 766, 773 (N.D. Ill. 2007)). Plaintiff devotes most of his argument to his contention that USPS cannot show that Truhlar was aware that he was violating any rule by not reporting his band income. The court disagrees. First, evidence contained in the Inspection Service's report suggested that Plaintiff was aware that he had to report income from his music activities, as Candace Vucsko wrote that she told him he needed to include income he derived from his recording studio and from writing songs on the CA-7.[5] (Investigative Memo. at 2, Ex. 64 to Pl.'s Mem.) Vucsko could not remember such a conversation during her deposition in this case, but the statement was nevertheless contained in the Investigatory Memorandum and could

---

[5] The obviously hearsay nature of this statement is not relevant to the court's decision here, as the court is only determining whether USPS had just cause to issue Plaintiff a notice of removal in 2001. Nothing prevents USPS from considering this statement when it was provided in an internal report in making its just cause determinations.

13

have reasonably been relied upon by USPS at the time it decided to issue the notice of removal. Similarly, the fact that ECAB stated in 2006 that Plaintiff did not knowingly misstate his income has no bearing on whether USPS possessed just cause in 2001 to issue a notice of removal. Because Plaintiff's claim is that USPS violated the CBA by issuing a notice of removal without just cause, the inquiry must be whether USPS possessed just cause at the time it made its decision. The ECAB decision therefore bears no relevance to USPS's just cause determination. Indeed, even if ECAB's findings had been made prior to USPS's issuance of the notice of removal, USPS would not have been bound to abide by those findings. *See NALC v. USPS*, 272 F.3d 182, 189 (3d Cir. 2001) (arbitrator in employment action between union and employer not bound by the Office of Workers' Compensation Programs determination).

Plaintiff also argues that the "rule" that was allegedly violated was the compensation forfeiture statute (5 U.S.C. § 8106(b)(2)), and that USPS was therefore required to find that Plaintiff "knowingly" lied on the forms as required by the statute. This argument fails for two reasons. First, to the extent a "knowingly" standard might be required, USPS need not meet the standard that would be applied by a court; such a reading would too tightly constrain the notion of "just cause." In making a just cause determination, USPS is not required, by either the CBA or the JCAM, to prove all of the elements listed in the JCAM at the level of formality necessary in a court proceeding. (JCAM at 16-1, Ex. 73 to Pl.'s Mem. (concept of just cause "contains no rigid rules that apply in the same way in each case of discipline or discharge").) Second, and more fundamentally, the Notice of Removal was not issued with the allegation that Plaintiff violated 5 U.S.C. § 8106(b)(2); the Notice of Removal actually charged Truhlar with "Unacceptable Conduct as Evidenced by Your Failure to Disclose Pertinent Information on Department of Labor Form CA-7," listing four separate ELM provisions. (Notice of Removal, Ex. 11 to Pl.'s Mem.) Even if USPS could not demonstrate that Plaintiff "knowingly" violated the statute by lying on his CA-7 forms to a degree that would satisfy a court, Plaintiff still could have run afoul of the ELM provisions

14

regarding "Unacceptable Conduct," which prohibits employees from engaging in "dishonest, notoriously disgraceful or immoral conduct, or other conduct prejudicial to the Postal Service"; or the provision under "Standards of Conduct" that requires Plaintiff to not "affect[] adversely the confidence of the public in the integrity of the Postal Service"; or the provision specifying an employee's duty of loyalty, requiring employees "to be loyal to the government and uphold the policies of the Postal Service." Thus, even if USPS lacked just cause to conclude that Plaintiff *knowingly* violated a federal statute, it nevertheless could have concluded from the evidence before it that there was just cause to conclude that Plaintiff had violated the ELM.

The other elements listed in the JCAM are easily satisfied and warrant little discussion: a rule against lying on government forms is clearly reasonable; its consistent enforcement is not in dispute; the thoroughness of the investigation is demonstrated by the Inspection Service's lengthy investigation that culminated in a five-page written report with nineteen exhibits; and termination is a reasonable consequence of lying on a government form that impermissibly allows an individual to retain sums wrongly obtained from the government. The final element, that the discipline be administered in a timely fashion, is also met, as Plaintiff received his termination notice two months after the completion of the investigation and less than six months after the start of the investigation. Relying on the JCAM's guidelines for interpreting just cause, then, USPS possessed just cause to terminate Plaintiff.

Plaintiff also argues that USPS violated the CBA by failing to either hold his grievances in abeyance until the DOL appeal was resolved or to consider reinstatement after DOL found in his favor violated the CBA. This argument has little traction. Plaintiff does not cite a single provision in the CBA that the USPS violated by acting in this manner. The best he can do is point to deposition testimony from Postmaster Anders that she might have acted differently had she known that Plaintiff's appeal was still pending; this falls far short of establishing a breach of the CBA. Indeed, as discussed above, Plaintiff cannot even show that the decision of the USPS to terminate

15

his employment would have been different if it had known of DOL's decision in Plaintiff's favor. *See NALC*, 272 F.3d at 189. Plaintiff also urges that the 2002 agreement to hold the grievances in abeyance depended upon resolution of the DOL matter as well as the criminal investigation, but the record does not support this assertion. (2002 Grievance Settlement Forms, Ex. G to Smith Decl., Attach. to 825 56.1 (agreement to hold grievance in abeyance depended only on disposition by U.S. Attorney's Office); Smith Dep. 154:3-10, Ex. DD to Pl.'s Mem. (same).) Although Anders suggested in her deposition that the pendency of the DOL proceeding was relevant to her decision, Plaintiff has again pointed to no provision of the CBA that was violated by terminating him prior to final resolution of the DOL matter. This court is not required to scour the record in search of support for Plaintiff's argument, *see Winters*, 498 F.3d at 744, and Plaintiff cannot simply point to behavior that he believes is unfair and label it a violation of the CBA.

Finally, Plaintiff offers an alternative argument: if Truhlar's September 28, 2001 interview in which he declined to answer Reece's questions out of fear of a pending criminal investigation influenced USPS's decision to terminate him, the discharge was an unconstitutional violation of his Fifth Amendment rights. Although a private employer may be entitled to rely upon an employee's refusal to answer questions in its decision to terminate the employee, a government employer such as USPS may not do so without extending immunity to the employee. *See Atwell v. Lisle Park District*, 286 F.3d 987, 990 (7th Cir. 2002); *Chan v. Wodnicki*, 123 F.3d 1005, 1009 (7th Cir. 1997) ("[T]he threat of job loss for a public employee is a sufficient threat to require that the employee be granted immunity from prosecution before he is required to answer questions about his public responsibilities."). There is no record of USPS's ever offering immunity to Truhlar, and the Notice of Removal issued to Truhlar does make a reference to Plaintiff's refusal to answer USPS's questions. (Notice of Removal at 2, Ex. 11 to Pl.'s Mem.) Still, the majority of the document is concerned with the substantial evidence against Plaintiff showing that he misrepresented his income on the CA-7 forms. (*Id.*) The court thus concludes that USPS's just cause determination

was not impermissibly based on his refusal to answer questions.

Plaintiff has not established a genuine issue of material fact that would prove USPS violated the CBA. The court therefore has no reason to consider whether the union breached its duty of fair representation, because summary judgment must be granted in favor of both Defendants. *See Crider*, 130 F.3d at 1245.

## **CONCLUSION**

For the reasons stated above, Defendant John Grace Branch's Motion for Summary Judgment [74] and Defendant United States Postal Service's Motion for Summary Judgment [79] are hereby granted.

ENTER:

Dated: February 10, 2009

*(signature)*
REBECCA R. PALLMEYER
United States District Judge